No. 26-60180 consolidated with Nos. 26-60181, 26-60194

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

SUNIL S. PATEL; LAURIE M. MCANALLY-PATEL,
*Petitioners - Appellants,*

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent - Appellee.*

On Appeal from the United States Tax Court
Nos. 24344-17, 11352-18, 25268-18 (Jones, J.)

# OPENING BRIEF OF PETITIONERS-APPELLANTS


Cameron T. Norris
Ryan M. Proctor
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Petitioners-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

1. Nos. 26-60180, 26-60181, 26-60194, *Patel v. Comm'r;*

2. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

Sunil S. Patel

Laurie McAnally-Patel

Magellan Insurance Company

Plymouth Insurance Company

Integrated Clinical Research, LLC

Strategic Clinical Research Group, LLC

Ophthalmology Specialists of Texas

CONSOVOY MCCARTHY PLLC

Cameron T. Norris

Ryan M. Proctor

CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY

David D. Aughtry, Jr.

Patrick J. McCann, Jr.

Norah Bringer

Nicholas D. Doukas

Sheri S. Wilder

Emerald G. Smith

Kevin R. Oveisi

Alicia H. Eyler

David A. Hubbert

William M. Paul

Sebastian Voth

William D. Richard

Commissioner of Internal Revenue

*/s/ Cameron T. Norris*
Attorney of Record for
Petitioners-Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument. Nearly all large businesses in America use captive insurance, an insurance company that is wholly owned by its insureds. Thousands of small businesses can do so only because Congress has given small captives favorable tax treatment. The decision below jeopardizes that practice by making it virtually impossible for a small captive to qualify for that treatment. This case also presents important, far-reaching questions about the role of federalism and federal common law in the interpretation of the Tax Code.

## TABLE OF CONTENTS


Table of Authorities ........ v

Jurisdictional Statement ........ 1

Statement of the Issues ........ 1

Statement of the Case ........ 2

A. Captive insurance has many public and private benefits. ........ 3

B. Congress creates tax benefits to promote small captives, but the IRS resists Congress's choice. ........ 4

C. The Patels form captives to insure their small businesses. ........ 9

D. The IRS determines that the Patels' captives did not provide legitimate insurance, and the Tax Court upholds that determination. ........ 12

Standard of Review ........ 14

Summary of Argument ........ 15

Argument ........ 18

I. The Patels' captives provided insurance. ........ 18

A. The Patels' captives shifted risk. ........ 20

B. The Patels' captives distributed risk. ........ 21

C. The Patels' captives provided insurance in its commonly accepted sense... 38

II. At minimum, the Patels are not liable for the economic-substance penalty. .... 47

Conclusion ........ 49

Certificate of Service ........ 50

Certificate of Compliance ........ 50

## TABLE OF AUTHORITIES

### Cases

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) .......... 45

*AMERCO v. Comm'r*,
96 T.C. 18 (1991) .......... 38

*AMERCO v. Comm'r*,
979 F.2d 162 (9th Cir. 1992) .......... 38

*Avrahami v. Comm'r*,
149 T.C. 144 (2017) .......... 8, 34, 35, 36, 46

*Caylor Land & Dev. v. Comm'r*,
T.C. Memo. 2021-30 .......... 35

*CIC Servs. v. IRS*,
592 F. Supp. 3d 677 (E.D. Tenn. 2022) .......... 7

*CIC Servs. v. IRS*,
593 U.S. 209 (2021) .......... 7, 32, 33, 43

*CIC Servs. v. IRS*,
No. 3:25-cv-146 (filed E.D. Tenn. Oct. 15, 2025) .......... 36

*Clark v. Sweeney*,
607 U.S. 7 (2025) .......... 37

*Clougherty Packing Co. v. Comm'r*,
811 F.2d 1297 (9th Cir. 1987) .......... 19, 20, 30, 31

*Coltec Indus. v. United States*,
454 F.3d 1340 (Fed. Cir. 2006) .......... 24, 26

*Cross Refined Coal v. Comm'r*,
45 F.4th 150 (D.C. Cir. 2022) .......... 54

*Dep't of Treasury v. Fabe*,
508 U.S. 491 (1993) .......... 18

*Drake Plastics v. IRS*,
830 F. Supp. 3d 611 (S.D. Tex. 2026). .......... 8

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938) .......... 26

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 36

*Flight Options, LLC v. United States*,
177 F.4th 709 (6th Cir. 2026) ........ 32

*Frank Lyon Co. v. United States*,
435 U.S. 561 (1978) ........ 43, 44

*Garland v. Cargill*,
602 U.S. 406 (2024) ........ 32

*Gibbons v. Ogden*,
22 U.S. 1 (1824) ........ 42

*Gould v. Gould*,
245 U.S. 151 (1917) ........ 32

*Gregory v. Helvering*,
293 U.S. 465 (1935) ........ 24, 26, 43

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*,
440 U.S. 205 (1979) ........ 16, 34

*Harper Grp. v. Comm'r*,
96 T.C. 45 (1991) ........ 22, 38

*Harper Grp. v. Comm'r*,
979 F.2d 1341 (9th Cir. 1992) ........ 22

*Haynes v. United States*,
353 U.S. 81 (1957) ........ 31

*Helvering v. Le Gierse*,
312 U.S. 531 (1941) ........ 12, 16, 18, 19, 20, 31, 38, 39

*Humana Inc. v. Comm'r*,
881 F.2d 247 (6th Cir. 1989) ........ 6, 33

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999) ........ 27

*Keller v. Comm'r*,
312 U.S. 543 (1941) ........ 16, 39

*Knight v. Thompson*,
797 F.3d 934 (11th Cir. 2015) ........ 45, 46

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 18

*Malone & Hyde, Inc. v. Comm'r*,
62 F.3d 835 (6th Cir. 1995) ........ 47, 48

*Petteway v. Galveston County*,
111 F.4th 596 (5th Cir. 2024) ... 37

*R.V.I. Guar. Co. & Subsidiaries v. Comm'r*,
145 T.C. 209 (2015) ... 46

*Rent-A-Ctr., Inc. v. Comm'r*,
142 T.C. 1 (2014) ... 20, 25, 34, 35

*Ross v. Odom*,
401 F.2d 464 (5th Cir. 1968) ... 16, 19, 20, 40

*Rsrv. Mech. Corp. v. Comm'r*,
T.C. Memo. 2018-86 ... 34, 35

*Rsrv. Mech. Corp. v. Comm'r*,
34 F.4th 881 (10th Cir. 2022) ... 34

*Sacks v. Comm'r*,
69 F.3d 982 (9th Cir. 1995) ... 43

*Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London*,
587 F.3d 714 (5th Cir. 2009) ... 28, 29

*Salty Brine I, Ltd. v. United States*,
761 F.3d 484 (5th Cir. 2014) ... 26, 45, 48

*SEC v. Variable Annuity Life Ins. Co.*,
359 U.S. 65 (1959) ... 29

*Summa Holdings v. Comm'r*,
848 F.3d 779 (6th Cir. 2017) ... 27, 29, 43

*Swift v. Comm'r*,
144 F.4th 756 (5th Cir. 2025) ... 5, 14, 15, 20, 21, 22, 23, 25, 30, 34, 35, 37, 46

*Taniguchi v. Kan. Pac. Saipan*,
566 U.S. 560 (2012) ... 18, 38

*Tucker v. Comm'r*,
766 F. App'x 132 (5th Cir. 2019) ... 24

*United States v. Del. Dep't of Ins.*,
66 F.4th 114 (3d Cir. 2023) ... 3

*United States v. Jacobs*,
306 U.S. 363 (1939) ... 18

*United States v. Miller*,
604 U.S. 518 (2025) ... 32

*United States v. South-Eastern Underwriters Ass'n*,
322 U.S. 533 (1944) ........ 27

**Constitutional Provisions**

U.S. Const. art. I, §8, cl.3 ........ 42

**Statutes**

100 Stat. 2405-06 (1986) ........ 5

124 Stat. 1068-69 (2010) ........ 25

129 Stat. 3106-08 (2015) ........ 6

15 U.S.C. §1011 ........ 18, 28

15 U.S.C. §1012 ........ 28, 29, 42

I.R.C. §162(a) ........ 2, 5, 6, 12, 43, 44

I.R.C. §6213(a) ........ 1

I.R.C. §6214 ........ 1

I.R.C. §6662(b)(6) ........ 1, 14, 47

I.R.C. §6662(i) ........ 1, 14, 47

I.R.C. §6707A(a) ........ 7

I.R.C. §6707A(b) ........ 7, 8

I.R.C. §6707A(c)(1) ........ 7

I.R.C. §7442 ........ 1

I.R.C. §7482(a)(1) ........ 1

I.R.C. §7482(b)(1)(A) ........ 1

I.R.C. §7483 ........ 1

I.R.C. §7701(o)(1) ........ 25, 26, 44, 48, 49

I.R.C. §7701(o)(5)(A) ........ 14, 24, 25, 26, 41

I.R.C. §831(a) ........ 5, 13, 16, 35, 37

I.R.C. §831(b) ........ 1, 2, 3, 6, 7, 8, 12, 13, 15, 16, 17, 18, 32, 33, 35, 36, 37, 38, 43, 44

Revenue Act of 1924, ch.234, 43 Stat. 253 ........ 36

Tenn. Code Ann. §56-13-103 ........ 41

Tenn. Code Ann. §56-13-105 ........ 5

Tenn. Code Ann. §56-13-108 .......... 5

Tenn. Code Ann. §56-13-109 .......... 5

Tenn. Code Ann. §56-13-112 .......... 4, 23

U.S.C. §6501(c)(10) .......... 8

U.S.C. §6662A(c) .......... 8

**Rules**

Fed. R. App. P. 13(a)(1)(A) .......... 1

**Regulations**

*Micro-Captive Listed Transactions*, 90 Fed. Reg. 3,534 (2025) .......... 3, 4, 8, 36, 46

**Guidance**

*Internal Revenue Manual* Ex. 4.32.1-1 (2024) .......... 8

IRS Notice 2016-66,
2016-47 I.R.B. 745 .......... 7

Rev. Rul. 2001-31,
2001-26 I.R.B. 1348 .......... 6

Rev. Rul. 2002-89,
2002-52 I.R.B. 984 .......... 15, 22

Rev. Rul. 2002-90,
2002-2 C.B. 985 .......... 20, 23

Rev. Rul. 77-316,
1977-2 C.B. 53 .......... 6

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) .......... 19, 30, 39

Blank & Glogower, *The Trouble with Targeting Tax Shelters*,
74 Admin. L. Rev. 69 (2022) .......... 7

J. Comm. on Taxation, JCX-144-15, *Technical Explanation of the PATH Act, H. Amend. #2 to Sen. Amend. to H.R. 2029* (2015) .......... 33

Scalia & Garner, *Reading Law* (2012) .......... 27, 32

*The Random House Dictionary of the English Language* (2d ed. 1987) .......... 19, 30

*Webster's Third New International Dictionary* (1981) .......... 19, 30

## JURISDICTIONAL STATEMENT

The Tax Court had jurisdiction under I.R.C. §6213(a), §6214, and §7442. It entered its decisions finally determining Petitioners' tax deficiencies and penalties on December 23, 2025. ROA.26-60180.116715, 117181, 117263, 117758. Petitioners timely filed notices of appeal on March 18, 2026. §7483; Fed. R. App. P. 13(a)(1)(A); ROA.26-60180.116719-116721, 117185-117187, 117762-117764. This Court has jurisdiction under I.R.C. §7482(a)(1). Venue is proper in this circuit because Petitioners' legal residence was in Texas when they filed their petitions. §7482(b)(1)(A); ROA.26-60180.115276.

## STATEMENT OF THE ISSUES

A captive-insurance company is an insurance company that is wholly owned by its insureds. Congress has created a tax break for small captives, I.R.C. §831(b), and has declared that state law must ordinarily prevail over federal law in the insurance context. With the approval of state regulators, Sunil Patel, and his wife Laurie, created two captives to insure their small businesses. The Tax Court held that the captives did not provide "insurance" under §831(b) because they did not cover thousands of independent risks (like large commercial insurers do) and because they did not satisfy the Tax Court's standard of acceptable insurance practice (that it apparently created as a matter of federal common law).

1. Did the Patels' captives provide "insurance" under I.R.C. §831(b)?

2. If the Patels' captives did not provide insurance, are the Patels liable for the economic-substance penalty in I.R.C. §6662(b)(6) and (i)?

## STATEMENT OF THE CASE

Nearly all large corporations insure some of their business through a captive-insurance company. As the name suggests, a captive is an insurance company under the control of its insured. To encourage their use, the Tax Code gives captives certain tax advantages, like letting the insured corporation deduct the cost of insurance under I.R.C. §162(a). In the 1980s, Congress added a new tax exemption, §831(b), to allow small businesses to reap the benefits of captive insurance. For small businesses, the tax savings from §831(b) offset the costs that once made captive insurance something only big businesses could afford.

The IRS is not fond of captive insurance, and it especially dislikes §831(b). For decades, the agency has sought through regulations, guidance, and litigation to make it impossible for small captives and their owners to obtain favorable tax treatment, only to be rebuffed by courts. The agency's latest "discovery" of its supposed latent power to get rid of captives is risk distribution, one of the basic elements of insurance. For the past dozen years, the IRS has maintained that a small captive does not adequately distribute risk—and so is not real "insurance"—unless it insures thousands of geographically disparate, independent risks of multiple distinct policyholders. This standard is (by design) impossible to meet for an insurance company created to cover a single small business. The IRS has also invited the Tax Court to use federal common law to develop stringent standards of acceptable practice that captives must follow to obtain favorable tax treatment. The Tax Court has accepted this invitation, even though Congress sought

to promote captive insurance and has taken the extraordinary step of providing that state insurance law should preempt federal law absent a clear statement to the contrary.

The IRS and the Tax Court are in need of a course correction. In the context of §831(b), risk distribution must be a requirement that is attainable for individuals, like the Patels, seeking to obtain coverage for their own small businesses. And courts cannot use federal common law to undermine the tax policies Congress has chosen.

### A. Captive insurance has many public and private benefits.

"A captive insurance company is an insurance company that is wholly owned and controlled by its insureds." *United States v. Del. Dep't of Ins.*, 66 F.4th 114, 116 n.1 (3d Cir. 2023). Captive insurance thus differs from commercial insurance, which insures the risks of unrelated entities. Captive insurance is ubiquitous in the modern economy. The world's largest firms use captives, including over 90% of Fortune 500 companies. ROA.26-60180.56097.

Captive insurance is widespread because it offers major benefits. Firms benefit from captive insurance because it lets them obtain coverage tailored to their needs, including insurance policies for low-frequency, high-severity risks that commercial insurers often do not underwrite. *See Micro-Captive Listed Transactions*, 90 Fed. Reg. 3,534, 3,541 (2025). These include potentially catastrophic business-interruption risks, like COVID-19, for which captives paid out claims when commercial coverage often did not. ROA.26-60180.53183-53184, 56088. Unlike commercial insurance, where a firm's efforts to mitigate risk create profits for the outside insurer, captives keep those profits

within the corporate family. ROA.26-60180.53236, 53239-53240, 56387-56388, 56735. In other words, insuring through a captive allows firms to "rea[p] the captive company's underwriting revenues" when they successfully mitigate risk. *Del. Dep't of Ins.*, 66 F.4th at 117. If a risk is too great for a captive to bear, it can purchase reinsurance at wholesale prices from the secondary market, which firms seeking commercial insurance cannot legally access. *See, e.g.*, Tenn. Code Ann. §56-13-112.

In addition to the private benefits that firms receive, captive insurance provides benefits to the public in equally important ways. Captive insurance alleviates the moral hazard that is inherent in commercial insurance. When a firm insures through a captive, it has a financial incentive to mitigate risk, as liability ultimately remains within the corporate family. ROA.26-60180.56719-56720. That incentive creates a safer environment for employees, customers, and members of the public affected by the firm's operations. And since commercial insurance is more likely to focus on high-frequency, low-severity events, captive insurance can be the only way for business owners that are vulnerable to infrequent, catastrophic risks to obtain coverage. *See Micro-Captive Listed Transactions*, 90 Fed. Reg. at 3,542.

### B. Congress creates tax benefits to promote small captives, but the IRS resists Congress's choice.

For 40 years, Congress has used the Tax Code to encourage small businesses to take advantage of captive insurance. Though the IRS has repeatedly attempted to thwart this policy choice, courts have consistently rebuffed the IRS's efforts.

Historically, small businesses seldom used captive insurance because of the high costs involved with setting up and operating a captive. *See* ROA.26-60180.56701. States impose significant capitalization requirements on captives to ensure they can cover losses when risks materialize. *See, e.g.*, Tenn. Code Ann. §56-13-105. States also require captives to comply with complex regulatory requirements, including filing annual financial statements, obtaining actuarial certifications, and undergoing detailed audits. §§56-13-108, -109. Meeting these requirements demands lawyers, accountants, underwriters, claims adjusters, and actuaries—services that don't come cheap. For many small businesses, these costs and regulatory burdens made using captive insurance financially unworkable.

Those barriers were removed with the Tax Reform Act of 1986. Ordinarily, when a business establishes a captive insurer, the business can deduct the premium payments from its taxable income, I.R.C. §162(a), but the payments are taxable income for the captive, §831(a). The Tax Reform Act of 1986, however, let insurers elect not to be taxed on their premium income so long as they received no more than $1.2 million in premium payments per year. 100 Stat. 2405-06 (enacting §831(b)). Following this legislation, "the captive industry has grown steadily," and captive insurers have become "very useful to many relatively small firms" as a "too[l]" for "risk financing." Bendure-Rep.3, ROA.24-60270.81407, *Swift v. Comm'r*, 144 F.4th 756 (5th Cir. 2025) (IRS expert).

While Congress was incentivizing captive insurance, the IRS was working to destroy it. From 1977 until 2001, the IRS took the position that captives *never* offer

legitimate insurance, reasoning that, unlike other forms of insurance, captives keep risk within the same "economic family." Rev. Rul. 77-316, 1977-2 C.B. 53. The IRS thus claimed that captive-insurance arrangements couldn't qualify for favorable tax treatment under §162(a) and §831(b). *Id.* Courts unanimously rejected the IRS's position—holding that, so long as a captive and its insured are "separate and distinct corporations," nothing prevents them from providing legitimate insurance. *Humana Inc. v. Comm'r*, 881 F.2d 247, 257 (6th Cir. 1989); *see* Rev. Rul. 2001-31, 2001-26 I.R.B. 1348 ("No court … accepted the economic family theory set forth in Rev. Rul. 77-316."). In 2001, the IRS finally waived the white flag, pledging that going forward it would address "whether captive insurance transactions constitute valid insurance … on a case-by-case basis." Rev. Rul. 2001-31.

In 2015, Congress passed, and President Obama signed, the Protecting Americans from Tax Hikes Act, which expanded §831(b)'s tax benefits. 129 Stat. 3106-08. The PATH Act increased §831(b)'s ceiling on premiums to $2.2 million, to be adjusted annually for inflation. *See* §831(b)(2)(A)(i), (E).

The PATH Act also clarified that traditional captives could benefit from §831(b). The PATH Act requires insurance companies to meet one of two "diversification requirements" to claim §831(b) status. §831(b)(2)(B). An insurer can have five or more policyholders. §831(b)(2)(B)(i)(I). Alternatively, it can have as few as one policyholder so long as the owners of the insurance company are the same as the owners of the

insured assets. §831(b)(2)(B)(i)(II). By this second route, the Act creates an explicit path for traditional captives to claim §831(b) treatment.

What Congress had given, the IRS (once again) sought to take away. One year after the PATH Act, the IRS issued Notice 2016-66, 2016-47 I.R.B. 745, which designated the bulk of captive-insurance arrangements claiming §831(b) treatment "transactions of interest." A transaction of interest is one that the IRS has deemed to have "a potential for tax avoidance or evasion." §6707A(c)(1). A taxpayer who engages in a transaction of interest must provide detailed reports on the transaction with his tax return, §6707A(a)-(b), and thereby "provide IRS agents with an 'audit roadmap.'" Blank & Glogower, *The Trouble with Targeting Tax Shelters*, 74 Admin. L. Rev. 69, 76 (2022). "When the IRS announces that a tax strategy is a … transaction of interest, market demand for that strategy among taxpayers typically ceases." *Id.* at 76-77.

Once again, the courts stepped in to stop the IRS's unlawful targeting of small captives. The IRS first contended that no court could review the lawfulness of Notice 2016-66, but the Supreme Court unanimously rejected that argument. *CIC Servs. v. IRS*, 593 U.S. 209 (2021). On remand, a district court vacated the notice, holding that the IRS did "not identify any facts or data supporting its belief" that small-captive transactions "have the potential for tax avoidance or evasion." *CIC Servs. v. IRS*, 592 F. Supp. 3d 677, 685 (E.D. Tenn. 2022).

Undeterred, the IRS followed up with an even more aggressive attempt to smother demand for small captives. In 2025, the IRS issued a new rule designating a

large swath of small captives "listed transactions." *See Micro-Captive Listed Transactions*, 90 Fed. Reg. 3,534. A listed transaction is one that the IRS has deemed to be "abusive." *Internal Revenue Manual* Ex. 4.32.1-1 (2024). Listed transactions are subject to more stringent requirements than transactions of interest, backed by even stiffer penalties for noncompliance. *E.g.*, §6501(c)(10), §6662A(c), §6707A(b)(2).

The IRS has paired this new rule with an aggressive enforcement campaign denying §831(b) status to individual small captives. *See Micro-Captive Listed Transactions*, 90 Fed. Reg. at 3,538 (collecting cases, including this one). To date, the Tax Court has upheld the IRS's denials, reasoning that small captives (which under §831(b) cannot have more than $1.2 million or $2.2 million in premium income) do not provide legitimate insurance because they do not cover the thousands of independent risks that large commercial insurers do. *See, e.g.*, *Avrahami v. Comm'r*, 149 T.C. 144, 183-84 (2017). The IRS has then turned around and pointed to its Tax Court victories as its principal justification for why most small captive insurers should be deemed presumptively abusive. *See* 90 Fed. Reg. at 3,538.

Yet again, the courts have stepped in to check the IRS. Earlier this year, a district court vacated the IRS's listed-transaction designation. *Drake Plastics v. IRS*, 830 F. Supp. 3d 611, 654 (S.D. Tex. 2026), *appeal pending*, No. 26-20219 (5th Cir. filed June 11, 2026). The court held that the designation exceeded the IRS's statutory authority because the IRS had not demonstrated that small captives "are presumptively tax avoidant." *Id.* at 641.

### C. The Patels form captives to insure their small businesses.

Sunil Patel is a Texas-based physician who specializes in retinal surgery. In 2000, he formed his own eye-surgery practice, Ophthalmology Specialists of Texas. ROA.26-60180.115277. Sunil also conducts clinical research trials on experimental drugs for retina diseases through two companies he established: Integrated Clinical Research and Strategic Clinical Research Group. ROA.26-60180.115278. The first business refers 98% of the other businesses' patients. ROA.26-60180.115278. It operates across seven locations in west Texas. ROA.26-60180.48026, 58375. It employs five physicians and 70 individuals total. ROA.26-60180.48026, 58375, 115278.

In 2002, Sunil's wife Laurie, who is also a physician, was sued by a patient for free care she provided at a regional hospital's clinic for indigent patients. ROA.26-60180.115278. As a result, the Patels met in 2003 with an attorney to discuss asset protection, including captive insurance. ROA.26-60180.115278. The Patels opted not to start a captive at that time, since they believed the cashflow from Sunil's practice did not justify the significant administrative cost of forming, owning, and operating a captive. ROA.26-60180.56701.

In the early years of his practice, Sunil relied on the local hospital to provide operating rooms for his surgeries on his patients. ROA.26-60180.56701-56702. The hospital would not provide Sunil a consistent operating time, so his patients often had to wait hours for their surgeries. ROA.26-60180.56702. To remedy this problem, in 2005, Sunil and several other physicians opened West Texas Hospital, a 14-bed surgical

hospital. ROA.26-60180.115278-115279. While the hospital was in operation, Sunil and his partner performed 1,000 surgeries there without incident. ROA.26-60180.53181-53182. In 2007, a patient at the hospital suffered complications following spinal surgery performed by a different doctor. ROA.26-60180.115279. The patient was transferred to another hospital and ultimately died. ROA.26-60180.115279.

Following the patient's death, West Texas Hospital became the subject of negative media coverage. ROA.26-60180.115279. The Centers for Medicare & Medicaid Services then terminated the hospital's Medicare contract, causing the hospital to lose 60-70% of its revenue, including over $400,000 for services already rendered. ROA.26-60180.56713-56714, 115279. Commercial insurance did not cover any of these losses. ROA.26-60180.53183. Although Sunil believed that CMS lacked a legitimate basis for terminating the hospital's contract, the hospital did not have the assets to stay in business pending an appeal, and so it had to close in 2007. ROA.26-60180.56713-56714, 115279. As a result of that closure, the Patels lost several million dollars, and over four dozen employees lost their jobs. ROA.26-60180.52115, 53116-53117, 115279.

A few months after the hospital closure, Sunil purchased a book about asset protection, which included a chapter on captive insurance. ROA.26-60180.115279. Sunil again thought about starting a captive at that time, but ultimately chose not to. ROA.26-60180.115279. In 2011, Sunil incorporated Ophthalmology Specialists of Texas as a limited-liability company. ROA.26-60180.115277 n.7. Around that time, he

also repurchased the book on asset protection and decided to go forward with forming a captive. ROA.26-60180.115279-115280.

The Patels formed the captive Magellan Insurance Co. in 2011. ROA.26-60180.115283. Magellan is licensed as an insurance company in a foreign country, St. Kitts. ROA.26-60180.115283. The Patels formed a second captive, Plymouth Insurance Co., in 2016. ROA.26-60180.115286. From 2013 to 2016, the years at issue here, Magellan and Plymouth issued insurance policies to the Patels' business entities for a variety of risks, ranging from administrative actions to natural peril to loss of key employees to commercial crime to litigation expenses. ROA.26-60180.115287-115294. The Patels' business entities paid premiums to the captives for this coverage. ROA.26-60180.115287-115294.

To distribute the risk they had assumed, Magellan and Plymouth participated in a reinsurance pool maintained by Capstone Reinsurance Co. ROA.26-60180.115295-115296. Members of the pool paid 51% of their premium income to the pool in exchange for a reinsurance policy covering 51% of their total net losses. ROA.26-60180.115295. The members also agreed to collectively assume 100% of Capstone's losses in the reinsurance pool. ROA.26-60180.115296. In 2014, the State of Tennessee examined Capstone and approved it as a risk-distribution reinsurance pool for captive-insurance companies. ROA.26-60180.115282. From 2012 to 2021, Capstone paid about $27 million in claims. ROA.26-60180.52229-52230. Magellan and Plymouth paid their

pro rata share of these claims every year they participated in the pool. ROA.26-60180.115307.

### D. The IRS determines that the Patels' captives did not provide legitimate insurance, and the Tax Court upholds that determination.

From 2013 to 2016, the Patels' captives elected to be taxed as small insurance companies under §831(b). ROA.26-60180.115307-115308. In those same years, the Patels deducted their premium payments to the captives as business expenses under §162(a) in their joint tax returns. ROA.26-60180.115307-115308.

In 2017 and 2018, the IRS issued three notices of deficiency to the Patels, disallowing their business-expense deductions for their premium payments and imposing penalties for their alleged underpayments. ROA.26-60180.115307-115308. The IRS determined that the captives did not provide genuine "insurance" under §831(b), meaning the Patels could not claim their payments to the captives as deductible business expenses. The Patels filed petitions in the Tax Court challenging the IRS's determinations, and the Tax Court consolidated the three cases for trial, briefing, and disposition. ROA.26-60180.115274 n.1.

The Supreme Court has identified two "elements" of "insurance" for tax purposes, "risk-shifting" and "risk-distributing." *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941). The Patels contended that their captives shifted risk by assuming liability for various potential losses by their medical companies. And the captives distributed risk

both by covering a variety of their medical companies' risks and by participating in the Capstone pool.

Following a trial, the Tax Court sustained the IRS's deficiency determinations. Skipping over risk shifting, the court held that the captives had not achieved risk distribution. The court held that while Capstone might distribute risk as a matter of form, it did not genuinely function as an insurance company "as a matter of substance." ROA.26-60180.115311 & n.18. Applying a nine-factor test of its own creation, the Tax Court deemed Capstone illegitimate because it did not pay out enough claims and did not negotiate contracts or set premium amounts in a sufficiently rigorous way. ROA.26-60180.115312-115315. The court added that the captives' direct policies failed to distribute risk because they did not cover the thousands of independent risks that large commercial insurers had covered in cases arising under §831(a), which does not have the strict premium limits of §831(b). ROA.26-60180.115316-115317.

In the alternative, the Tax Court held that the captives did not provide "insurance in the commonly accepted sense," a distinct requirement in addition to risk shifting and risk distribution under Tax Court precedent (but not Supreme Court or Fifth Circuit precedent). ROA.26-60180.115318-115319. Applying a seven-factor test, the court held that the captives failed this requirement because their premiums were too high and because the Patels were motivated by the tax benefits of §831(b). ROA.26-60180.115319-115324.

After additional briefing, the Tax Court issued a separate decision sustaining the IRS's penalty determinations. ROA.26-60180.116657. As relevant here, in 2013-16, the IRS assessed penalties for claiming benefits disallowed under the economic-substance doctrine. ROA.26-60180.116667; *see* §6662(b)(6), (i). The "economic substance doctrine" is a "common law doctrine under which tax benefits … are not allowable if the transaction does not have economic substance or lacks a business purpose." §7701(o)(5)(A). The Tax Court deemed it appropriate to invoke this doctrine because the court had previously applied it in other insurance cases. ROA.26-60180.116675-116678. The court held the captives objectively lacked economic purpose because the Capstone arrangement was a sham and the Patels' premiums were unreasonably high. ROA.26-60180.116679-116680. The court also held that the Patels lacked a legitimate purpose because they created the captives "to reduce their federal income tax bill." ROA.26-60180.116682.

The Tax Court then entered judgment in each of the three cases, determining a total pre-interest liability of $2,276,857.20—a $1,737,447.00 total deficiency and $539,410.20 in total penalties. ROA.26-60180.116715, 117181, 117758.

The Patels filed appeals in all three cases. This Court consolidated the appeals. Doc.20.

## STANDARD OF REVIEW

This Court reviews the Tax Court's conclusions of law de novo and its findings of fact for clear error. *Swift*, 144 F.4th at 762. The "characterization of a transaction for

tax purposes is a question of law subject to de novo review," and "the particular facts from which that characterization is made are reviewed for clear error." *Id.*

## SUMMARY OF ARGUMENT

**I.** The Patels' captives provided "insurance" under §831(b), because they both shifted risk and distributed risk.

**A.** The captives' insurance policies shifted risk. By their terms, the policies made the captives liable for potential economic losses faced by the Patels' medical companies. The Tax Court never held otherwise.

**B.** The captives distributed risk both through their participation in the Capstone reinsurance pool and through their direct policies.

Through Capstone, the Patels' captives devoted 51% of their premium income to covering the losses of unrelated entities, which is plainly adequate to achieve risk distribution. *See* Rev. Rul. 2002-89, 2002-52 I.R.B. 984, 984-85. The Tax Court held otherwise only by deeming Capstone a sham insurance company under the common-law economic-substance doctrine. But that doctrine does not apply here. Tennessee regulators have examined Capstone and determined that it provides legitimate risk distribution for small captives. The McCarran-Ferguson Act expressly provides that the regulation of insurance is reserved to the States. In the face of that congressional directive, federal courts cannot claim an implicit common-law authority to develop standards for insurance companies that supplant state standards.

The captives' direct policies on their own independently achieve risk distribution. A §831(b) captive could not have premiums of more than $1.2 million per year in the relevant timeframe, and such captives are expressly allowed to have only one to four policyholders. In that context, the Patels' captives' coverage of multiple distinct risks faced by five physicians, at least 70 employees, seven operating locations, and one to three entities is enough to establish "some element of spreading risk more widely." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 214 n.12 (1979). The Tax Court held otherwise only by improperly holding the captives to the standard of large insurers subject to §831(a).

**C.** The Tax Court's alternative holding that the captives do not provide "insurance in the commonly accepted sense" is wrong twice over. A transaction that shifts and distributes risk *is* insurance in the commonly accepted sense. And even if providing insurance in the commonly accepted sense were a distinct requirement, the Patels' captives would satisfy it.

By fashioning its own multi-factor balancing test, the Tax Court misread the Supreme Court's decision in *Le Gierse*. That case applied the standard textualist approach of giving an undefined term its ordinary (or "commonly accepted") meaning, distilling that meaning to two "elements"—risk shifting and risk distribution. *Le Gierse*'s companion case, *Keller v. Comm'r*, 312 U.S. 543, 545 (1941), and this Court's precedent, *Ross v. Odom*, 401 F.2d 464, 468 (5th Cir. 1968), confirm that risk shifting and risk distribution are the only elements of "insurance."

Regardless, the Tax Court was wrong to hold that the captives failed its seven-factor test. Again relying on the economic-substance doctrine, the Tax Court held that the Patels' captives were not legitimate insurance because they were motivated by a desire to capture tax benefits and because their premiums were too high. This holding overrides the judgment of state and foreign regulators that the Patels' captives are legitimate insurance companies, and so again is inconsistent with the McCarran-Ferguson Act. Further, the economic-substance doctrine, which tests whether a transaction rests on tax-independent considerations, cannot coherently apply to §831(b), a provision meant to *subsidize* captive insurance with favorable tax treatment. Even if the doctrine applied, the Patels had a legitimate nontax purpose because they sought to protect their assets *and* obtain favorable tax treatment. The doctrine does not forbid actions taken with a "mixed" tax and nontax motive. Finally, the Tax Court's finding that the captives' premiums were too high cannot stand because the court arbitrarily ignored the Patels' expert testimony to the contrary.

**II.** At minimum, the Patels are not liable for the economic-substance penalty. As already explained, the economic-substance doctrine is not relevant to this case. Even if it were, the Patels' captives had economic substance. The captives objectively changed the Patels' economic position by providing them with insurance coverage for a variety of specified risks. And the Patels subjectively had a legitimate mixed motive because they acted both to lessen their tax liability and to protect their assets.

## ARGUMENT

The Patels have no tax deficiency because their captives provided legitimate insurance. And at minimum, the Patels are not liable for the economic-substance penalty.

### I. The Patels' captives provided insurance.

The Patels have no tax deficiency. The Tax Court ruled that the Patels' captive premium payments were not deductible business expenses because the captives did not provide "insurance" within the meaning of §831(b). ROA.26-60180.115309-115310. But as a matter of law, the Patels' captives did provide insurance.

Because the Tax Code does not define "insurance," the term must be given "its commonly accepted sense." *Le Gierse*, 312 U.S. at 540; *accord Taniguchi v. Kan. Pac. Saipan*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). Ascertaining the commonly accepted sense of "insurance" is a purely interpretive question—is this transaction "insurance"? It is not a question of tax or insurance policy—does this transaction adhere to (the IRS's conception of) best practices for insurance? The "wisdom" of tax legislation is for "Congress" alone "to determine." *United States v. Jacobs*, 306 U.S. 363, 371 (1939). Ambiguity in the Tax Code is not an invitation for the IRS to impose its own ideas about tax policy, much less insurance policy. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399 (2024). And agency meddling in insurance policy is especially inappropriate, because Congress has taken the extraordinary step of specifically guaranteeing that the regulation of "the business of insurance" will be left to "the several States." 15 U.S.C. §1011; *see Dep't of Treasury v. Fabe*, 508 U.S. 491, 499-500 (1993).

When it comes to captive insurance, however, the IRS cannot help but meddle. The agency has repeatedly attempted to give its hostility to captive insurance the force of law, only to be rebuked by courts. *Supra* Statement of Case, Part B. It is therefore critical for courts in captive-insurance cases to hold the IRS to its proper, limited role.

As a matter of ordinary meaning, "insurance" means "coverage by contract in which one party agrees to indemnify or reimburse another for loss that occurs under the terms of the contract." *The Random House Dictionary of the English Language* 989 (2d ed. 1987); *accord Webster's Third New International Dictionary* 1173 (1981) ("coverage by contract whereby for a stipulated consideration one party undertakes to indemnify or guarantee another against loss by a specified contingency or peril"); *Insurance*, *Black's Law Dictionary* (12th ed. 2024) ("A contract by which one party (the *insurer*) undertakes to indemnify another party (the *insured*) against risk of loss, damage, or liability arising from the occurrence of some specified contingency.").

The Supreme Court has distilled the "commonly accepted sense" of "insurance" into two "elements": "risk-shifting and risk-distributing." *Le Gierse*, 312 U.S. at 539-40. Risk shifting occurs when a contract "transfer[s] from the insured to the insurer the consequences of a possible future event." *Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1306 (9th Cir. 1987); *see Ross*, 401 F.2d at 468. Risk distribution occurs when an insurer covers "a sufficient number of independent risks" to protect against the possibility of a single costly claim causing "financial calamity" for the insurer. *Swift*, 144 F.4th

at 765. A transaction satisfying both these elements qualifies as insurance. *Le Gierse*, 312 U.S. at 540; *Ross*, 401 F.2d at 467.

Here, Magellan and Plymouth provided genuine insurance because they both shifted and distributed risk. The Patels properly deducted their premiums to these companies as business expenses.

### A. The Patels' captives shifted risk.

Since the Tax Court addressed only the elements it thought the Patels' captives failed, it did not address risk shifting. The Patels' captives readily satisfy this first element of insurance.

"Risk shifting occurs if a person facing the possibility of an economic loss transfers some or all of the financial consequences of the potential loss to the insurer, such that a loss by the insured does not affect the insured because the loss is offset by the insurance payment." Rev. Rul. 2002-90, 2002-2 C.B. 985; *see Ross*, 401 F.2d at 468. When a company enters an insurance contract with a related entity, the "balance sheet" test "provides the proper analytical framework to determine" whether the contract genuinely shifts risk. *Rent-A-Ctr., Inc. v. Comm'r*, 142 T.C. 1, 21 (2014); *accord Humana Inc. v. Comm'r*, 881 F.2d 247, 252 (6th Cir. 1989); *Clougherty*, 811 F.2d at 1305; Rev. Rul. 2002-90. Under that test, courts do not deem risk shifting illusory simply because the insurer and the insured share a common owner. *See Humana*, 881 F.2d at 253. Courts instead look solely "to the assets of the insured" entity to determine whether the occurrence of a covered loss affects its "balance sheet and net worth." *Rent-A-Ctr.*, 142 T.C. at 18-19.

Magellan and Plymouth readily satisfy the balance-sheet test. Magellan and Plymouth entered into insurance contracts with the Patels' three medical companies. ROA.26-60180.115287. In each contract, the medical companies agreed to pay an insurance premium in exchange for a specified coverage amount in the event the companies suffered a specified kind of economic loss. *See* ROA.26-60180.115287-115294. As the Tax Court recognized, "Magellan's and Plymouth's direct written policies contained the necessary terms to make them valid and binding insurance contracts." ROA.26-60180.115321. The policies thus shifted the covered risks from the medical companies to Magellan and Plymouth.

### B. The Patels' captives distributed risk.

Risk distribution "emphasizes the broader, social aspect of insurance as a method of dispelling the danger of the potential loss by spreading its cost throughout the group." *Ross*, 401 F.2d at 467. Risk distribution exists when an insurer covers "a sufficient number of independent risks" such that the risk of "financial calamity" from any one realized loss is lessened. *Swift*, 144 F.4th at 765. Whereas risk shifting focuses "on the individual contract between the insured and the insurer," risk distribution focuses on the relationship between "the insurer" and its broader portfolio of risks. *Humana*, 881 F.2d at 251.

Magellan and Plymouth satisfied the element of risk distribution by two independent means: their participation in the Capstone reinsurance program and their direct policies to the Patels' medical companies.

#### 1. The captives distributed risk through reinsurance.

Magellan and Plymouth's reinsurance arrangement distributed risk. The Tax Court's reliance on federal common law to disregard this arrangement was error.

One way for a captive insurer to achieve risk distribution is by "insuring unrelated entities." *Swift*, 144 F.4th at 766. A captive can insure unrelated entities directly, or it can participate in a reinsurance pool in which it agrees to cover a portion of the losses of other, unrelated insurers in exchange for a guarantee that a portion of its own losses will be covered. Rev. Rul. 2002-89, 2002-52 I.R.B. at 984. Under Tax Court precedent, a captive has sufficient risk distribution if "unrelated insureds comprise approximately 30 percent of [its] business." *Harper Grp. v. Comm'r*, 96 T.C. 45, 59-60 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992). The IRS has ruled that a captive achieves risk distribution if more than half of its "total risks borne" are attributed to "unrelated entities," "either directly or as a reinsurer of these risks." Rev. Rul. 2002-89, 2002-52 I.R.B. at 984-85.

The Patels' captives readily satisfy risk distribution under this standard. Magellan and Plymouth participated in the Capstone reinsurance program. Under that program, every participating insurer paid 51% of its premium income to Capstone in exchange for a reinsurance policy covering 51% of the total net loss on each direct policy issued by the insurer. ROA.26-60180.115295. The participants further "agreed to collectively assume 100 percent of the losses Capstone incurred under the various Reinsurance Agreements it entered with the participating captives in the pool." ROA.26-

60180.115296. Through these agreements, 51% of the total risk borne by Magellan and Plymouth was attributable to the unrelated entities participating in the Capstone pool. Specifically, in the years at issue, the Patels' captives assumed the risk of 40 to 89 participating entities, for a total of 543 to 1,115 policies across 30 to 47 types of coverage. ROA.26-60180.55788-55789; *see* ROA.26-60180.23555, 23558, 23560, 23562. These unrelated entities and policies plainly constitute "a sufficient number of independent risks" to make Magellan and Plymouth what an ordinary speaker of English would call insurance. *Swift*, 144 F.4th at 765; *cf.* Rev. Rul. 2002-90 (coverage of 12 subsidiaries of a common parent adequate to distribute risk).

Tennessee regulators agree that Capstone achieves risk distribution for small captives. In 2014, the Tennessee Department of Commerce & Insurance "examined Capstone as a reinsurance pool," ROA.26-60180.115282, to determine whether it legitimately distributed risk for small captive insurance companies, ROA.26-60180.56070; *see* Tenn. Code Ann. §56-13-112(c). The Department sought to examine "all aspects" of the pool—"who's running the pool, who were the participants," what was "the history of the pool," how "were the pool funds held" and "premiums paid." ROA.26-60180.56073. First an analyst in the Department's captive section, who was a forensic accountant with a specialty in fraud, examined Capstone with the assistance of an outside actuary. ROA.26-60180.56071-56072. Then a team of five or six members of the captive section, including the director, reviewed the analyst's initial recommendation. ROA.26-60180.56081-56082. "Based on its examination," the Department "approved

Capstone Reinsurance as a risk-distribution reinsurance pool" for "captive insurance companies." ROA.26-60180.115282. Given this authoritative determination, there can be no question that Magellan and Plymouth distribute risk through Capstone.

The Tax Court disagreed only through an erroneous assertion of federal common-law authority to deem Capstone illegitimate. The Tax Court did not deny that Capstone's policies on their face achieved risk distribution. *See* ROA.26-60180.115311-115312. The court likewise recognized Tennessee's determination that the pool legitimately distributed risk. ROA.26-60180.115314. The court nevertheless determined it had common-law authority to disregard Capstone as a sham. Relying on the economic-substance doctrine, the court held that Capstone did not provide legitimate insurance "as a matter of substance." ROA.26-60180.115311 & n.18, 116679. But Congress has expressly provided that the regulation of insurance is reserved to the States. In the face of that congressional directive, federal courts cannot claim an implicit common-law authority to develop standards for insurance companies that supplant the standards established by the States.

The "economic substance doctrine" is a "common law" doctrine dating back to the Supreme Court's decision in *Gregory v. Helvering*, 293 U.S. 465 (1935). *See* §7701(o)(5)(A); ROA.26-60180.116669. The doctrine permits the IRS to "disregar[d], for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." *Coltec Indus. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006); *accord Gregory*, 293 U.S. at 470; *Tucker v. Comm'r*, 766 F. App'x 132, 137-38 (5th Cir. 2019);

*see* §7701(o)(5)(A) (defining "economic substance doctrine" as "a common law doctrine under which tax benefits … with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose"). Congress codified the economic-substance doctrine in 2010. 124 Stat. 1068-69 (codified at §7701(o)). As codified, the doctrine provides that a "transaction" has "economic substance" if it "changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position" and "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." §7701(o)(1)(A)-(B).

Although it did not mention the economic-substance doctrine by name, the Tax Court relied on the doctrine to disregard the Capstone insurance pool. The court invoked a nine-factor test from its own caselaw used "[t]o determine whether an entity is performing the functions of an insurance company" "as a matter of substance." ROA.26-60180.115311-115312 & n.18 (citing ultimately *Rent-A-Ctr.*, 142 T.C. at 10). The test is designed to assess whether an entity is "a bona fide insurance company" or "a sham entity created primarily to generate Federal income tax savings." *Rent-A-Ctr.*, 142 T.C. at 10-11. It "captures whether the reinsurance pool arrangement was a true insurance arrangement … in substance." *Swift*, 144 F.4th at 767 (cleaned up). And as the Tax Court recognized elsewhere, determining that an insurance company "is essentially a sham corporation," or that a particular insurance arrangement is a "sham-transaction," is an application of the economic-substance doctrine. ROA.26-60180.116677.

The Tax Court's reliance on the economic-substance doctrine was improper. As the court acknowledged elsewhere, the economic-substance doctrine does not apply in every tax case. ROA.26-60180.116673. The doctrine applies only "[i]n the case of any transaction to which [it] is relevant." §7701(o)(1). In other words, in some cases, it simply is not "relevant," §7701(o)(1), whether the IRS or a court believes that a transaction has "economic reality," *Coltec*, 454 F.3d at 1352. As for when the economic-substance doctrine is "relevant," Congress has left that issue to continued common-law development by courts. *See* §7701(o)(5)(C) ("The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if [§7701(o)] had never been enacted."); ROA.26-60180.116673, 116678 n.16.

The economic-substance doctrine is "relevant" only when its application is necessary to give effect to Congress's intent. "There is no federal general common law." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). All "law" must have "some definite authority behind it." *Id.* at 79. In the context of the Tax Code, that authority must come from Congress. Courts thus can apply the economic-substance doctrine only when doing so "enforce[s] the legislative purpose" of Congress. *Salty Brine I, Ltd. v. United States*, 761 F.3d 484, 494 (5th Cir. 2014); *see Gregory*, 293 U.S. at 470 (invoking the doctrine to enforce Congress's "plain intent"); *Coltec*, 454 F.3d at 1353 ("The economic substance doctrine represents a judicial effort to enforce the statutory purpose of the tax code.").

Courts must carefully limit the scope of the economic-substance doctrine to avoid usurping Congress's legislative role. A statute's "purpose must be derived from

the text" and "defined precisely." Scalia & Garner, *Reading Law* 56 (2012). Otherwise the court will simply "smuggl[e] in the answer to the question before" it and reduce statutory interpretation to the court's own notion of "justice or equity." *Id.* at 56-57. When the application of the economic-substance doctrine rests on nothing more than "general concerns about tax avoidance, … allegations of tax avoidance begin to look like efforts at text avoidance." *Summa Holdings v. Comm'r*, 848 F.3d 779, 787 (6th Cir. 2017). The Tax Code uses "nearly mathematic precision … to reduc[e] its purpose to text," making "judicial innovation based on misty calls to higher purposes" particularly suspect. *Id.* at 789. Unless courts define Congress's purposes carefully, narrowly, and with close attention to statutory text, the economic-substance doctrine risks simply "becoming a tool that allows the Commissioner to place labels on transactions to avoid textual consequences he doesn't like." *Id.* at 787.

Here, Congress has made clear that the regulation of insurance is for the States. For most of American history, the Supreme Court "had consistently held that the business of insurance was not commerce" subject to federal regulation. *Humana Inc. v. Forsyth*, 525 U.S. 299, 306 (1999). This changed in 1944, when the Court "held for the first time that an insurance company doing business across state lines engages in interstate commerce." *Id.* (citing *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553 (1944)). Reacting against this decision, "Congress in 1945 enacted the McCarran-Ferguson Act." *Id.*

The Act "declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. §1011. Consequently, "[t]he business of insurance … shall be subject to the laws of the several States which relate to the regulation or taxation of such business." §1012(a). "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance." §1012(b). The "Act thus allows state law to reverse-preempt an otherwise applicable federal statute." *Safety Nat. Cas. Corp. v. Certain Underwriters at Lloyd's, London*, 587 F.3d 714, 720 (5th Cir. 2009) (en banc).

The McCarran-Ferguson Act forecloses any application of the economic-substance doctrine here. The Act establishes a federal policy that federal law will not "frustrate any declared state policy or interfere with a State's administrative regime" in the realm of insurance without clear congressional authorization. *Humana*, 525 U.S. at 310. And here, Tennessee's administrative regime has determined that Capstone achieves legitimate risk distribution for small captives. Applying an independent and more stringent federal analysis of whether Capstone achieves risk distribution in substance supplants that regime. But no statute directs the IRS or the federal courts to supplant state law with their own standard. And "general concerns about tax avoidance" cannot trump the more specific and textually grounded policy that insurance regulation is for the

States. *Summa Holdings*, 848 F.3d at 787. If Congress doesn't even want *its own statutes* to trump state insurance law absent a clear statement, it could not have implicitly authorized judges to trump state insurance law with their own common-law standards of insurance best practices. *See* §1012(b).

The Tax Court's response that Tennessee "does not have the authority to determine whether an entity operates as an insurance company within the meaning of the Code" is unpersuasive. ROA.26-60180.115314. It is of course true that the meaning of "insurance" in the Tax Code is a federal question, and a transaction that does not meet the ordinary meaning of the term "insurance" (such as an annuity) doesn't become insurance under the Tax Code simply because state law labels it so. *See SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 69-73 (1959). But the question here is not the meaning of the term "insurance" in the Tax Code, which all agree requires risk distribution. The question is whether Congress has implicitly authorized the IRS and the federal courts to determine that an insurance transaction that on its face distributes risk is a sham as a matter of economic reality, in the teeth of a state regulator's determination to the contrary. Given Congress's express and emphatic reservation of insurance regulation to the States—to the point of "reverse-preempt[ing]" its own statutes—there can be no principled basis for finding an implicit authorization to override state law. *Safety Nat.*, 587 F.3d at 720.

Finding risk distribution through Capstone is consistent with *Swift*, in which the McCarran-Ferguson Act was not at issue. There was no finding in *Swift* that state

regulators had determined that the reinsurance pools at issue there achieved legitimate risk distribution for small captives. *See* 144 F.4th at 762-63; T.C. Memo. 2024-13, at *19-23. And neither this Court nor the Tax Court considered the factor "whether [the pool] was subject to regulatory control and met minimum statutory requirements." *See* 144 F.4th at 767-68; T.C. Memo. 2024-13, at *32-36; *compare* ROA.26-60180.115314-115315. This Court thus had no occasion to consider whether a federal court can apply the common-law economic-substance doctrine to determine the legitimacy of a reinsurance pool's risk distribution when a state regulator has already made that determination. Here, in contrast, the Tax Court recognized Tennessee's determination that Capstone genuinely distributed risk and overrode it. ROA.26-60180.115314-115315. That ruling cannot stand.

**2. The captives' direct policies distributed risk.**

The basic purpose of a captive-insurance company is to cover the risks of its sister entities. In accomplishing this basic purpose, Magellan and Plymouth achieved risk distribution.

Risk distribution is a modest requirement that is secondary in importance to risk shifting. "The risk shifting requirement … describes the essence of insurance." *Clougherty*, 811 F.2d at 1305-06. Dictionaries generally define "insurance" exclusively in terms of risk shifting. *See Random House Dictionary* 989 ("coverage by contract in which one party agrees to indemnify or reimburse another for loss that occurs under the terms of the contract"); *Webster's Third* 1173 (similar); *Insurance*, *Black's Law Dictionary* (similar).

The Supreme Court has similarly called the "underwriting of risks" "the *one* earmark of insurance as it has commonly been conceived of in popular understanding and usage." *Variable Annuity*, 359 U.S. at 73 (emphasis added). And it has defined "health insurance" solely in terms of risk shifting—"an undertaking by one person for reasons satisfactory to him to indemnify another for losses caused by illness." *Haynes v. United States*, 353 U.S. 81, 83 (1957). As for *Le Gierse*, the Supreme Court did not address how much weight to put on the risk-distribution element because "the resolution of that case depended only on the absence of risk shifting." *Clougherty*, 811 F.2d at 1300 n.5; *see Le Gierse*, 312 U.S. at 541.

As caselaw and the dictionaries illustrate, an ordinary speaker of English would call a transaction "insurance" if it shifts risk from one party to the other and involves "*some* element of spreading risk more widely." *Grp. Life*, 440 U.S. at 214 n.12 (emphasis added). Demanding more than *some* level of risk distribution would convert the Court's task from determining whether a transaction is "insurance" into whether an insurer satisfies some judicial sense of best practices for the insurance industry. An insurer with too few policyholders might be at risk of going out of business, but it is still engaged in "insurance" transactions as a matter of ordinary speech.

An overly demanding risk-distribution standard would also deprive taxpayers of fair notice of what the Tax Code requires. Most consumers cannot see an insurer's entire balance sheet when they purchase an insurance policy. If a detailed knowledge of the full scope of "independent risks" an insurer's policies cover (or of its reinsurance

arrangements) were necessary to determine whether the insurer has achieved risk distribution, *see* ROA.26-60180.115311-115318, then taxpayers would often have no way of knowing whether the transaction they've entered constitutes "insurance" that they can deduct as a business expense. That result would violate the principle that taxpayers must have "clear" notice of what transactions will trigger tax liability. *Gould v. Gould*, 245 U.S. 151, 153 (1917); *Flight Options, LLC v. United States*, 177 F.4th 709, 717 (6th Cir. 2026).

Risk distribution is an especially modest requirement in the context of §831(b). It is a "fundamental canon of statutory construction" that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Miller*, 604 U.S. 518, 533 (2025) (cleaned up). Here, the term "insurance" appears in §831(b), which provides "a tax break for small insurance companies," *CIC*, 593 U.S. at 213, specifically those with total premiums of $1.2 million or less for the years at issue here. §831(b)(2)(A)(i) (2012). The statute necessarily presumes that a company with $1.2 million or less in premiums can feasibly achieve the risk distribution necessary to be an "insurance" company. "Congress presumably does not enact useless laws." *Garland v. Cargill*, 602 U.S. 406, 427 (2024). "[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied." Scalia & Garner 192-93.

The PATH Act further clarifies that a small *captive* insurer can achieve the risk distribution necessary to provide genuine insurance. The Act's diversification

requirements create an express path for insurers with only one to four policyholders to qualify for §831(b)'s benefits. §831(b)(2)(B)(i)(II). In fact, the prototypical captive, which the diversification requirements plainly aim to include, has only one policyholder. J. Comm. on Taxation, JCX-144-15, *Technical Explanation of the PATH Act, H. Amend. #2 to Sen. Amend. to H.R. 2029*, at 202 (2015). Congress has explicitly determined that captives with limited premium income and policyholders can provide legitimate insurance—and should be subsidized for doing so. Imposing a risk-distribution standard that is impossible for small captives to clear dishonors that "congressional choice." *CIC*, 593 U.S. at 213.

*Humana* illustrates the proper approach to risk distribution. The captive there insured several sister entities. 881 F.2d at 248. After the Sixth Circuit found risk shifting, it had little trouble finding risk distribution as well, because "the captive insures several separate corporations within an affiliated group." *Id.* at 257. The sister entities and the captive all had the same parent company. *Id.* at 248. And all the entities were engaged in the same business—operating hospitals. *Id.* But neither of these features mattered for risk distribution. Because the existence of multiple corporate entities distributed risk to *some* extent, this modest element was satisfied. *Id.* at 256-57.

Magellan and Plymouth likewise satisfy risk distribution. An insurer covers independent risks when it covers different entities, employees, operating locations, and types of coverage. ROA.26-60180.115315-115316. During the period under review, "Magellan and Plymouth issued 22 to 36 policies" covering a variety of risks, ranging from

administrative actions to natural peril to loss of key employees to commercial crime to litigation expenses. ROA.26-60180.115317. Magellan at all times "insure[d] several separate corporations within an affiliated group." *Humana*, 881 F.2d at 257; *see* ROA.26-60180.115316. Ophthalmology Specialists of Texas, which both Plymouth and Magellan covered, had five physicians, 70 employees, and seven operating locations. ROA.26-60180.48026, 58375, 115278. Integrated Clinical Research and Strategic Clinical Research Group, which Magellan covered, had additional employees. ROA.26-60180.115278. By distributing risk across multiple entities, physicians, employees, and locations, Magellan and Plymouth's direct policies had "some element of spreading risk more widely." *Grp. Life & Health*, 440 U.S. at 214 n.12.

The Tax Court improperly demanded that Magellan and Plymouth achieve the risk distribution of a large insurer. The Tax Court concluded that a captive adequately distributes risk when it covers thousands of independent risks, but not when it offers a dozen or so policies to four or fewer insureds. ROA.26-60180.115315-115317. On the one hand, the court cited *Rent-A-Ctr.*, 142 T.C. at 24 (covering 14,000 employees, 7,100 vehicles, and 2,600 stores), and *Securitas Holdings v. Comm'r*, T.C. Memo. 2014-225, at *26-27 (covering 200,000 employees and 2,200 vehicles), as having adequate risk distribution. On the other hand, the court cited *Avrahami*, 149 T.C. at 181 (seven policies for four entities); *Rsrv. Mech. Corp. v. Comm'r*, T.C. Memo. 2018-86, at *35-36 (11 and 13 policies for three entities), *aff'd*, 34 F.4th 881 (10th Cir. 2022); *Swift*, T.C. Memo. 2024-13, at *29 (six to nine policies for two to three entities); and *Caylor Land & Dev. v.*

*Comm'r*, T.C. Memo. 2021-30, at *35 (insured only related parties in same geographic area), as having inadequate risk distribution. None of these cases provides a persuasive analogue to the §831(b) captives at issue here.

*Rent-A-Center* and *Securitas* involved §831(a) captives that received tens of millions of dollars in premiums annually. *See Rent-A-Ctr.*, 142 T.C. at 10; *Securitas*, T.C. Memo. 2014-225, at *16. Such captives can achieve a much greater distribution of risk than a §831(b) captive with only one to four policyholders and no more than $1.2 million in annual premiums. Relying on them as analogues here divorces the risk-distribution standard from what is feasible for a §831(b) captive.

*Avrahami*, *Reserve Mechanical*, *Swift*, and *Caylor* are unpersuasive for similar reasons. In each case, the Tax Court improperly faulted the §831(b) captive for failing to meet the level of risk distribution present in §831(a) cases like *Rent-A-Center* and *Securitas*. *See Avrahami*, 149 T.C. at 182-84; *Rsrv. Mech.*, T.C. Memo. 2018-86, at *35-36; *Swift*, T.C. Memo. 2024-13, at *28-31; *Caylor*, T.C. Memo. 2021-30, at *36-37. The decision below aggravated this defect, inferring from these cases that it is illegitimate for an insurer to cover only three or four entities or only related entities. ROA.26-60180.115316-115317. This view is squarely inconsistent with §831(b)(2)(B)(i)(II), which allows captive-insurance companies that cover only one to four related entities to take advantage of §831(b). The standard set by these cases thus nullifies Congress's judgment by making it all but impossible for a captive to claim §831(b) status.

Far from denying this result, the IRS celebrates it. In another case, it boasts that "every §831(b) captive reviewed on its merits by the Tax Court has been disallowed." Defs.' Cross-Mot. for Summ. Jdgt., Doc.25, at 29, *CIC Servs. v. IRS*, No. 3:25-cv-146 (filed E.D. Tenn. Oct. 15, 2025). Congress expressly guaranteed a path for captives to take advantage of §831(b). *See* §831(b)(2)(B)(i)(II); *supra* Statement of Case, Part B. The Tax Court has allowed the IRS to administratively repeal that guarantee.

In addition, the history behind §831(b) refutes the Tax Court's insistence that "risk exposures" be *wholly* "independent," not in "the same geographic area," and not in "the same … field" of business. ROA.26-60180.115317. "Section 831(b) arose out of tax laws specific to certain small and mutual insurers," such as "groups of farmers and fire associations," "which are traditionally held by their members in a given geographical location … for the protection of their own property." *Micro-Captive Listed Transactions*, 90 Fed. Reg. at 3,555; *see Avrahami*, 149 T.C. at 175-76 (tracing the origin of §831(b) to §231(10) of the Revenue Act of 1924); Revenue Act of 1924, ch.234, §231(10), 43 Stat. 253, 283 (exempting "farmers' or other mutual hail, cyclone, casualty, or fire insurance companies"). "[T]hese … small insurers" continue to "use section 831(b) to exclude premiums from taxable income" today. *Micro-Captive Listed Transactions*, 90 Fed. Reg. at 3,555. In other words, §831(b)'s *core* beneficiaries are insurance companies with geographically concentrated policyholders in the same industry facing related risks. The Tax Court's interpretation improperly ignores "the context from which the statute arose." *Fischer v. United States*, 603 U.S. 480, 498 (2024).

Finding risk distribution here is consistent with this Court's decision in *Swift*, since that decision never considered or applied §831(b)'s relaxed risk-distribution standard. As noted, the Tax Court in *Swift* held that certain captives did not provide genuine insurance because they did not achieve the level of risk distribution present in that court's previous §831(a) cases. T.C. Memo. 2024-13, at *28-31. On appeal, the taxpayers never argued to this Court that §831(b) imposes a more lenient risk-distribution standard than §831(a). *See Swift*-Appellants'-Br.14-19, 2024 WL 4326714. Appropriately following the parties' lead, this Court assumed that the same standard governs §831(a) and (b) and held that the captives did not achieve risk distribution because "the number of independent risks" that they covered was "smaller than the captives in" *Rent-A-Center* and *Securitas*. 144 F.4th at 766 (quoting *Swift*, T.C. Memo. 2024-13, at *31).

Because these issues and questions were never raised by the parties in *Swift*, this Court's decision establishes no precedent on whether §831(b) imposes a relaxed risk-distribution standard and, if so, under what circumstances it is met. "In our adversarial system of adjudication, … '[t]he parties frame the issues for decision,' while the court serves as 'neutral arbiter of matters the parties present.'" *Clark v. Sweeney*, 607 U.S. 7, 9 (2025). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Petteway v. Galveston County*, 111 F.4th 596, 608 (5th Cir. 2024) (en banc) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). This Court can and should hold that the Patels' captives' direct policies achieved risk distribution.

### C. The Patels' captives provided insurance in its commonly accepted sense.

The Tax Court held in the alternative that the captives do not qualify for treatment under §831(b) because they do not provide "insurance in the commonly accepted sense." ROA.26-60180.115318-115319. This holding is wrong for two reasons. A transaction that shifts and distributes risk by definition qualifies as insurance in its commonly accepted sense. And even if some independent third requirement were warranted, Magellan and Plymouth would satisfy it.

#### 1. The captives provided insurance in its commonly accepted sense because they shifted and distributed risk.

The Tax Court treated being "insurance in the commonly accepted sense" as a distinct element that a taxpayer must establish in addition to risk shifting and risk distribution. ROA.26-60180.115318-115319. It purported to derive that element from the Supreme Court's discussion of insurance in *Le Gierse*. *See Harper*, 96 T.C. at 58; *AMERCO v. Comm'r*, 96 T.C. 18, 38 (1991), *aff'd*, 979 F.2d 162 (9th Cir. 1992). But *Le Gierse* does not identify "insurance in the commonly accepted sense" as a distinct element. It holds the opposite: that a transaction with risk shifting and risk distribution *is* insurance in the commonly accepted sense.

*Le Gierse* applied standard textualist methodology to the term "insurance" in the Tax Code. "When a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi*, 566 U.S. at 566. Likewise, in *Le Gierse*, no provision of the Tax Code "ha[d] ever defined 'insurance,'" so the Court determined that "Congress used the word 'insurance' in its commonly accepted sense." 312 U.S. at 538, 540. And the

Court equated a transaction with the "elements of risk-shifting and risk-distribution" with "insurance" in its commonly accepted sense. *See id.* at 539 ("Historically and commonly insurance involves risk-shifting and risk-distributing."); *id.* at 540 (equating "the word 'insurance' in its commonly accepted sense" with a transaction "designed to shift to a group of individuals the risk" of the insured).

The Tax Court's contrary interpretation is incoherent. If the "commonly accepted sense" of insurance were a distinct inquiry from risk shifting and risk distributing, there would be no theoretical basis for identifying risk shifting and risk distributing as "elements" of insurance at all. *Id.* at 539. The Court would have simply conjured these legal requirements out of thin air. Instead, the Court identified "risk-shifting and risk-distribution" as "elements" of insurance because they *define* insurance in its commonly accepted sense. *Id.*

*Keller*, a companion case decided the same day as *Le Gierse*, confirms that risk shifting and risk distribution are the exclusive elements of insurance. *Keller* specifies that *Le Gierse* "stated" a "definition" of insurance. 312 U.S. at 545. A "definition" of a term is its "meaning." *Definition*, *Black's Law Dictionary*, *supra*. If other elements of insurance existed beyond risk shifting and risk distribution, then *Le Gierse* would not have stated a "definition." *Keller*, 312 U.S. at 545.

Circuit precedent reinforces that risk shifting and risk distribution are the only elements of "insurance" under the Tax Code. In *Ross*, this Court held that a state survivors' benefit program constituted life insurance because it shifted and distributed risk.

401 F.2d at 467-68. When the government objected that the program nevertheless did not resemble a "traditional … contract for insurance," the Court dismissed the argument as an improper attempt to "escap[e] from [the plan's] undeniable risk shifting and risk distribution." *Id.* at 468. Because the program satisfied both these elements, no further showing was needed to conclude that it was insurance. *Id.* So too here: Because Magellan and Plymouth satisfy both risk shifting and risk distribution, no further showing is needed to establish that they provide insurance.

#### 2. If providing insurance in its commonly accepted sense were a distinct element, the captives satisfied it.

The Tax Court applies a seven-factor test to determine whether a transaction amounts to insurance in its commonly accepted sense. ROA.26-60180.115319. Applying that test, the court recognized that Magellan and Plymouth had at least "some attributes of insurance companies." ROA.26-60180.115324. They were incorporated and regulated as insurance companies. They were adequately capitalized. Their policies contained "the necessary terms to make them valid and binding insurance contracts," and they paid claims. ROA.26-60180.115319-115324. Nevertheless, the court held that the captives were not genuine insurance companies because they were formed "to take advantage of increased tax benefits," had unusual insured-unfriendly terms, and charged expensive premiums. ROA.26-60180.115319-115324. This reasoning again improperly relies on the economic-substance doctrine. It also rests on a flawed account of the facts.

The Tax Court again wrongly relied on the economic-substance doctrine without explicitly invoking it. The court acknowledged that the captives' policies were structured

as valid and binding insurance contracts, and that the captives were "incorporated and regulated" as insurance companies. ROA.26-60180.115319. Its objections instead were that the decision to form the captives, the terms in their insurance contracts, and the premiums they charged were motivated by a desire to capture tax benefits. ROA.26-60180.115319-115325. Disregarding a transaction because it "lacks a business purpose" is an application of the economic-substance doctrine. §7701(o)(5)(A).

The McCarran-Ferguson Act again forecloses any application of the economic-substance doctrine to Plymouth. The Tennessee Department of Commerce & Insurance has licensed Plymouth as a legitimate captive-insurance company. *See* Tenn. Code Ann. §56-13-103; ROA.26-60180.115286. As part of the licensing process, Plymouth had to submit an application to the Department, including a business plan, feasibility study, biographical affidavits of owners and managers, financial projections, sample policies, and reinsurance agreements. ROA.26-60180.56084-56085. The Department approves applications only after an investigation that includes review by an independent actuary. ROA.26-60180.56072, 56080-56081. And Tennessee continues to regulate Plymouth on an ongoing basis. ROA.26-60180.115319. Imposing an independent and stricter federal standard for operating as a genuine insurance company would supplant Tennessee's administrative scheme in violation of the federal policy established by the McCarran-Ferguson Act. *Supra* Part I.B.1.

The economic-substance doctrine is not relevant to Magellan for similar reasons. St. Kitts has licensed Magellan as a legitimate captive-insurance company. ROA.26-

60180.115283. Like Plymouth, to be approved, Magellan had to submit a detailed business plan, which described the operations and risks of Magellan's prospective insureds and the lines of coverage Magellan proposed to provide. ROA.26-60180.44688-44700, 52197, 53396-53397, 55409. St. Kitts approves license applications after an investigation that involves review by an independent actuary. ROA.26-60180.56050-56051. And St. Kitts regulates Magellan on an ongoing basis. ROA.26-60180.115319. Magellan must maintain sufficient capital reserves, for instance, and submit annual reports. ROA.26-60180.56232-56233, 115320. And its policies are valid, binding insurance contracts under St. Kitts law. ROA.26-60180.52395, 115321. Here too, application of the economic-substance doctrine would supplant local regulation in violation of the McCarran-Ferguson Act's policy of federal non-interference.

It does not matter that St. Kitts is a foreign country rather than an American State. The McCarran-Ferguson Act's reverse-preemption rule applies specifically to U.S. States. 15 U.S.C. §1012. But the Act more broadly was a reaction against the Supreme Court's holding that "the business of insurance" constituted "commerce" under the Constitution. *Humana*, 525 U.S. at 306. The same sentence of the Constitution that gives Congress the power "[t]o regulate Commerce … among the several States" also gives Congress the power "[t]o regulate Commerce *with foreign Nations*." U.S. Const. art. I, §8, cl.3 (emphasis added). And the term "commerce" "must carry the same meaning throughout the sentence." *Gibbons v. Ogden*, 22 U.S. 1, 194 (1824). The McCarran-Ferguson Act thus establishes a federal policy of non-interference with state *and foreign*

regulation of insurance. That policy forecloses application of the economic-substance doctrine to Magellan.

The economic-substance doctrine also cannot apply to either captive because Congress in §831(b) meant to provide a "tax break" to small captives. *CIC*, 593 U.S. at 213. The doctrine's purpose is to ensure that taxpayers' asserted transactions rest on "tax-independent considerations." *Frank Lyon Co. v. United States*, 435 U.S. 561, 584 (1978). That purpose makes little sense if Congress has established favorable tax treatment precisely to encourage taxpayers to engage in certain transactions. "If the government treats tax-advantaged transactions as shams unless they make economic sense on a pre-tax basis, then it takes away with the executive hand what it gives with the legislative." *Sacks v. Comm'r*, 69 F.3d 982, 992 (9th Cir. 1995); *accord Cross Refined Coal v. Comm'r*, 45 F.4th 150, 158 (D.C. Cir. 2022). That approach subverts, rather than enforces, Congress's "plain intent." *Gregory*, 293 U.S. at 470. "No court has used [the economic substance doctrine] to override statutory provisions whose only function is to enable tax savings." *Summa Holdings*, 848 F.3d at 789. The Tax Court was wrong to cross that line by faulting the Patels for wanting "to take advantage of [§831(b)'s] increased tax benefits." ROA.26-60180.115320.

The Tax Court's rejoinder that this case concerns §162(a), not §831(b), does not work. *Cf.* ROA.26-60180.116678. It's true that the ultimate issue in this case is whether the Patels' premium payments to Magellan and Plymouth are valid business expenses under §162(a). ROA.26-60180.115307, 115309-115310. And §162 in isolation does not

encourage the operation of small captives. But as the Tax Court elsewhere recognized, the propriety of the Patels' deduction turns on whether their captives "ma[d]e a valid section 831(b) election." ROA.26-60180.115310; *see also* ROA.26-60180.115307; ROA.26-60180.115310 ("these cases hinge on whether the Patels' microcaptive insurance arrangement meets the definition of insurance," a term that appears in §831(b), not §162(a)). If the economic-substance doctrine does not foreclose a captive from electing §831(b) treatment, it does not foreclose a captive owner from claiming a deduction under §162(a).

Even if the Tax Court properly invoked the economic-substance doctrine, the court never found that the Patels acted "solely" to minimize their tax burden. *Frank Lyon*, 435 U.S. at 584. "[T]axpayers who act with mixed motives, seeking both tax benefits and profits for their businesses, can satisfy the business-purpose test." *Salty Brine*, 761 F.3d at 494; *see* §7701(o)(1)(B) (purpose element of a legitimate transaction satisfied if "the taxpayer has *a* substantial purpose" (emphasis added)). Here, the Patels acted both to protect their assets and to lessen their tax burden. The sudden closure of the West Texas Hospital in 2007 deeply affected the Patel family, causing them to lose substantial money and to let go of dozens of employees. ROA.26-60180.52111, 52115, 53116-53117, 55078. As Sunil testified at trial, his fear that his clinics faced the same risks led him to pursue captive insurance. ROA.26-60180.55065-55066.

Though the Tax Court purported to find Sunil's testimony not credible, its finding was infected by legal error. The court did not find Sunil inherently incredible; it

"believe[d] Dr. Patel's testimony about the end of the West Texas Hospital and its impact on him and his family." ROA.26-60180.115320. But the court ultimately rejected Sunil's testimony because it did not believe that "his experience with West Texas Hospital was *the reason* he decided to form captive insurance companies." ROA.26-60180.115320 (emphasis added). This finding improperly assumes a strict binary where either asset protection was the Patels' *main or sole reason* for setting up their captives or else the captives were nothing more than a tax-avoidance sham. *See also* ROA.26-60180.116680-116682 (assuming the same binary). Since a taxpayer can legitimately act from "mixed motives," the relevant inquiry was whether Sunil credibly testified that asset protection was *a reason* for setting up the captives. *Salty Brine*, 761 F.3d at 494. On that point, the Tax Court offered no reasons to disbelieve Sunil's testimony. Since the Tax Court based its credibility determination "upon a mistaken impression of applicable legal principles," this Court "is not bound" by that determination on appeal. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18 (2024).

At minimum, remand is necessary because the Tax Court did not adequately support its finding that the captives' premiums were unreasonable. It is "clearly erroneous" for the Tax Court to "arbitrarily ignore expert testimony." *Knight v. Thompson*, 797 F.3d 934, 942 (11th Cir. 2015) (quoting *United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir. 1978)). In determining the reasonableness of the captives' premiums, the Tax Court credited the Commissioner's expert and explained why it did not credit *one* of the Patels' experts. *See* ROA.26-60180.115322-115323 (discussing Rosenbach). But it entirely

ignored the Patels' other two experts—Robert Miccolis and Robert Walling—even though both parties discussed the two experts' views on premium pricing at length in their briefs. *See* ROA.26-60180.55792-55794, 55825-55827, 55832, 55864, 55868-55876, 58357-58360, 58398, 58539-58542.

Ignoring Miccolis was especially arbitrary. The Tax Court relied extensively on Miccolis's testimony to distinguish between true and false insurance in *R.V.I. Guar. Co. & Subsidiaries v. Comm'r*, 145 T.C. 209, 219, 222, 226, 233, 242 (2015). *R.V.I.* is a critical insurance precedent. The Tax Court has repeatedly cited it in its cases dealing with small captives, including in this very case. *E.g.*, ROA.26-60180.115310, 115317, 115321; *Swift*, T.C. Memo. 2024-13, at *27-28; *Avrahami*, 149 T.C. at 177, 183-84. And in newly issued regulations, the IRS has relied on *R.V.I.* to define what small captive transactions are likely to be abusive. *See Micro-Captive Listed Transactions*, 90 Fed. Reg. at 3,541. In this case, Miccolis calculated a reasonable premium range for Magellan and Plymouth's lines of coverage. All the captives' actual premiums fell within or below the ranges Miccolis calculated. ROA.26-60180.47141. Miccolis's conclusions squarely challenge the Tax Court's finding that "Magellan's and Plymouth's premiums were unreasonable" and not "actuarially sound." ROA.26-60180.115323. When the Tax Court has previously relied extensively on this expert on the same subject, it cannot simply "ignore" what he has to say without explanation. *Knight*, 797 F.3d at 942.

Ignoring the Patels' experts was not harmless error. The Tax Court found that only two of its seven insurance-in-the-commonly-accepted-sense factors weighed

against Magellan and Plymouth, and the reasonableness of premiums was the only factor that weighed "heavily" against them. ROA.26-60180.115320-115323. The Tax Court's determination that Magellan and Plymouth did not provide insurance in the commonly accepted sense cannot stand without its finding that the captives' premiums were unreasonable.

## II. At minimum, the Patels are not liable for the economic-substance penalty.

Even if this Court affirms the deficiency determination, it should reverse the economic-substance penalty. The Tax Court held that the Patels must pay penalties of 20 to 40 percent for years 2014 to 2016 because they engaged in transactions without economic substance. *See* §6662(b)(6), (i); ROA.26-60180.116667. But the economic-substance doctrine is not relevant to this case. Even if it were, the Patels' captive-insurance arrangements had economic substance.

As already discussed, the economic-substance doctrine is not relevant to this case. The IRS and the Tax Court have no implicit common-law authority to deem Magellan and Plymouth sham insurance transactions when Tennessee and St. Kitts have found them to be genuine. *Supra* Part I.C.2. And the doctrine does not apply to tax subsidies meant to encourage taxpayers to engage in certain transactions. *Id.*

The Tax Court did not identify any case applying the economic-substance doctrine in analogous circumstances. *See* ROA.26-60180.116675-116677. Only one of the cases the court cited dealt with "captive insurance." ROA.26-60180.116675 (citing *Malone & Hyde, Inc. v. Comm'r*, 62 F.3d 835 (6th Cir. 1995)). *Malone* did not deal with

§831(b) and so could not have addressed the propriety of applying the economic-substance doctrine to a tax subsidy. *See* 62 F.3d at 837. And none of the cases cited by the Tax Court addresses the McCarran-Ferguson Act. *See* ROA.26-60180.116675.

Regardless, the Patels' insurance arrangements had economic substance. The Patels' insurance policies with Magellan and Plymouth "change[d] in a meaningful way" their "economic position." §7701(o)(1)(A). Both Magellan and Plymouth had "valid and binding" insurance "policies," entitling them to payment in the event they "filed claims for covered losses." ROA.26-60180.115321.

The Tax Court never denied these realities. Instead, it held that the captives' transactions with Capstone were objectively without substance. ROA.26-60180.116679. As already explained, the McCarran-Ferguson Act requires respecting Tennessee's determination that Capstone provided genuine risk distribution. *Supra* Part I.B.1. And even if the captives' arrangement *with Capstone* had no effect on *the captives*, that doesn't change the fact that the Patels' arrangement *with the captives* had an economic effect on *the Patels*. And since the Patels are the "taxpayer[s]" in this case, their "economic position" is the relevant consideration here. §7701(o)(1)(A).

Whether the Patels "paid unreasonable and excessive premiums" is also irrelevant. ROA.26-60180.116680. "[T]ransactions lack objective economic reality if they do not vary, control, or change the flow of economic benefits" *at all*. *Salty Brine*, 761 F.3d at 494 (cleaned up). The IRS and the federal courts have no implicit authority to regulate excessive prices under the guise of enforcing the Tax Code. Regardless, the Tax Court's

finding that Magellan and Plymouth's premiums are excessive rests on its decision to arbitrarily ignore the Patels' experts. *Supra* Part I.C.2. And even if excessive prices had some bearing on the economic-substance doctrine, it would at most mean that only *some* of the money the Patels paid in premiums is a deductible business expense, not that *none* of it is.

The Patels also had a "substantial" nontax "purpose" for their captive-insurance arrangements. §7701(o)(1)(B). As already explained, the Patels permissibly formed their captives both to protect their assets and to lessen their tax liability. *Supra* Part I.C.2. None of the Tax Court's findings suggests that the Patels acted *solely* to avoid taxation. *See* ROA.26-60180.116680-116682.

## CONCLUSION

This Court should reverse the Tax Court with instructions to enter judgment in favor of the Patels. Alternatively, this Court should at least reverse and remand with instructions to reconsider the Tax Court's deficiency determination, to enter judgment in favor of the Patels on the economic-substance penalty, or both.

Respectfully submitted,

/s/ *Cameron T. Norris*
Cameron T. Norris
Ryan M. Proctor
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Petitioners-Appellants*

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will serve everyone requiring notice.

Dated: September 14, 2026

*/s/ Cameron T. Norris*
Counsel for Petitioners-Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and 5th Cir. R. 32.3 because it contains 12,110 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2. This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) and 5th Cir. R. 32.1 because it was prepared in Microsoft Word in 14-point Garamond, a proportionally spaced typeface.

Dated: September 14, 2026

/s/ Cameron T. Norris
Counsel for Petitioners-Appellants